UNITED STATES v. MIDWAY NORTHERN OIL CO. et al.
(and five other cases).

(District Court, S. D. California. May 1, 1916.)

Nos. 47, A–2, A–3, A–13, A–31, and A–30.

1. EQUITY &#9758;392—REHEARING—TIME FOR FILING PETITION.

While a court is without power to entertain a petition for rehearing after the term at which final decree was entered, where a petition is filed during the term by leave of court, the decree does not become final until the petition is disposed of.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 834–851; Dec. Dig. &#9758;392.]

2. JUDGMENT &#9758;388—VACATION—NOTICE TO PARTIES.

Entry of an order vacating a decree of dismissal without notice to the defendant, even if an error, does not affect the jurisdiction of the court to make the order.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 747–749; Dec. Dig. &#9758;388.]

&#9758;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. MINES AND MINERALS ⬤═17(1)—MINING CLAIMS—VALIDITY OF LOCATION.
   Under Rev. St. §§ 2320, 2329 (Comp. St. 1913, §§ 4615, 4628), no location
   of a mining claim, either lode or placer, valid as against the government,
   can be made until the discovery of mineral within the limits of the
   claim.

   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 24,
   27, 28; Dec. Dig. ⬤═17(1).]

4. MINES AND MINERALS ⬤═36—OIL AND GAS CLAIMS—EFFECT OF WITHDRAW-
   AL ORDER—"DILIGENT PROSECUTION OF WORK OF DISCOVERY."
   The saving clause in Act June 25, 1910, c. 421, § 2, 36 Stat. 847 (Comp.
   St. 1913, § 4524), providing that, on the withdrawal of public lands from
   sale or entry by presidential order, the rights of any person who at the
   date of any such order "is a bona fide occupant or claimant of oil, or
   gas bearing lands, and who at such date is in the diligent prosecution
   of work leading to the discovery of oil or gas, shall not be affected or
   impaired by such order so long as such occupant or claimant shall con-
   tinue in diligent prosecution of said work," does not protect or confer
   any rights upon persons who had merely made a filing prior to such
   order, but who were not on its date, for whatever reason, actually en-
   gaged in the diligent prosecution of work leading to discovery.

   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 87;
   Dec. Dig. ⬤═36.]

5. MINES AND MINERALS ⬤═2—MINING CLAIMS—EFFECT OF WITHDRAWAL OR-
   DER.
   The presidential order of September 27, 1909, temporarily withdraw-
   ing public lands within a designated area in California from entry or
   disposal under the mineral laws, did not cease to be operative on the
   passage of Act June 25, 1910, but continued in force until confirmed by
   order of July 2, 1910, made under such act, and its effect was to with-
   draw the lands from explorations for minerals as well as entry during
   such time.

   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 2;
   Dec. Dig. ⬤═2.]

6. MINES AND MINERALS ⬤═7—SUIT TO ENJOIN—TRESPASS AND WASTE—
   EQUITY—JURISDICTION.
   The United States may maintain a suit in equity to enjoin trespass
   upon public lands to which it has clear title, where the defendants are
   extracting and removing oil therefrom which constitutes their sole
   value, and on determining that the possession of defendants is without
   right, the court will retain jurisdiction to give full relief by a decree
   granting a permanent injunction and an accounting.

   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 7;
   Dec. Dig. ⬤═7.]

7. MINES AND MINERALS ⬤═7—SUIT TO ENJOIN TRESPASS AND WASTE—EQUITY
   —JURISDICTION.
   As to defendants joined in suit, however, who claim no right in the
   lands and are not charged with trespass, but who merely bought the
   oil from the operating defendants in the usual course of business, the
   complainant has a plain, adequate, and complete remedy at law by an
   action for conversion, and a court of equity is without jurisdiction.

   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 7;
   Dec. Dig. ⬤═7.]

8. UNITED STATES ⬤═126—RIGHTS AS SUITOR IN EQUITY.
   Where the sovereign comes into a court of equity, asserting a pecuniary
   demand against a citizen, or to protect its proprietary interests, its
   claims appeal, generally speaking, to the conscience of the chancellor

---

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

with the same, but not greater or less, force than those of a private individual under like circumstances.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 115; Dec. Dig. ☜126.]

9. MINES AND MINERALS ☜7—TRESPASS AND WASTE—RULE OF DAMAGES IN EQUITY.

On an accounting in a suit in equity by the United States against trespassers, who have built derricks, drilled wells, and extracted and marketed oil from public lands, but who entered upon the lands in good faith through a mistake of law, in the belief, under advice of reputable counsel, that they could acquire rights under the mineral laws, defendants will not be subjected to punitive damages by enforcing against them the rule of the common law in cases of willful trespass, and requiring them to account for the entire proceeds of all oil sold and to forfeit all improvements, but will be given credit for the cost of production, and allowed to set off the value of permanent and useful improvements made, and to remove their machinery and tools.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 7; Dec. Dig. ☜7.]

10. MINES AND MINERALS ☜7—TRESPASS AND WASTE—RULE OF DAMAGES IN EQUITY.

On the other hand, such defendants will not be given the benefit of the rule in favor of occupying claimants in good faith under color of title, by requiring the government to pay for their improvements before regaining possession.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 7; Dec. Dig. ☜7.]

In Equity. Suits by the United States against the Midway Northern Oil Company and others, against the Consolidated Midway Oil Company and others, against the American Oilfields Company and others, against David Kinsey and others, against the Midlands Oilfields Company, Limited, and others, and against the Associated Oil Company and others. On final hearing. Dismissed as to certain defendants, and decrees for the United States against all other defendants.

See, also, 216 Fed. 802.

Case No. 47:

A. E. Campbell and Frank Hall, Sp. Asst. Attys. Gen., for the United States.

Pillsbury, Madison & Sutro, of San Francisco, Cal., for defendant Standard Oil Co.

A. L. Weil, of San Francisco, Cal., for defendants Waite and others.

George E. Whitaker, of Bakersfield, Cal., and Frank H. Short, of Fresno, Cal., for defendants Lowell and others.

Walter F. Haas, of Los Angeles, Cal., for defendant Maricopa Northern Oil Co.

W. A. Sutherland, of Fresno, Cal., for defendant Miocene Oil Co.

Matthew S. Platz, of Bakersfield, Cal., for defendant Francis.

Case No. A–2:

A. E. Campbell and Frank Hall, Sp. Asst. Attys. Gen., for the United States.

James P. Sweeney, of San Francisco, Cal., for defendant Maricopa Oil Co.

A. L. Weil, of San Francisco, Cal., for defendants Maricopa Consol. Oil Co. and others.

George E. Whitaker, of Bakersfield, Cal., for defendants Midnight Oil Co. and others.

Pillsbury, Madison & Sutro, of San Francisco, Cal., for defendant Standard Oil Co.

Case No. A–3:

A. E. Campbell and Frank Hall, Sp. Asst. Attys. Gen., for the United States.

Andrews, Toland & Andrews, of Los Angeles, Cal., for defendant Union Oil Co.

James P. Sweeney, of San Francisco, Cal., for defendants Miocene Oil Co. and others.

A. L. Weil, of San Francisco, Cal., for defendants American Oilfields Co. and others.

George E. Whitaker, of Bakersfield, Cal., for intervener Coons.

Pillsbury, Madison & Sutro, of San Francisco, Cal., for defendant Standard Oil Co.

Case No. A–13:

A. E. Campbell and Frank Hall, Sp. Asst. Attys. Gen., for the United States.

A. L. Weil, of San Francisco, Cal., for defendants Midlands Oilfields Co. and others.

Andrews, Toland & Andrews, of Los Angeles, Cal., for defendant Union Oil Co.

Case No. A–31:

A. E. Campbell and Frank Hall, Sp. Asst. Attys. Gen., for the United States.

Edmund Tauszky, of San Francisco, Cal., for defendant Associated Oil Co.

C. Del Bondio, of Taft, Cal., for defendants Beers and others.

Case No. A–30:

A. E. Campbell and Frank Hall, Sp. Asst. Attys. Gen., for the United States.

A. L. Weil, of San Francisco, Cal., for defendants Midlands Oilfields Co. and others.

Andrews, Toland & Andrews, of Los Angeles, Cal., for defendant Union Oil Co.

BEAN, District Judge (sitting by special assignment). These cases involve closely related questions, were heard together, and it will be convenient to likewise dispose of them, noticing in the course of the opinion wherein they differ, if at all. They are suits in equity brought by the government for decrees that the several tracts of land particularly described in the bills, together with the mineral contents thereof, are the property of the United States, free from all claims of the defendants, or any of them, and for an injunction restraining the

defendants from trespassing thereon or extracting the oil therefrom, and an accounting for oil heretofore extracted and disposed of.

The lands in controversy are mineral (petroleum) lands of the United States situate in the Maricopa oil fields in California. They are included in presidential order of September 27, 1909, temporarily withdrawing all public lands, without particular designation, within an area of about 3,000,000 acres, the larger part of which was privately owned, "from all forms of location, settlement, selection, filing, entry, or disposal," under the mineral laws of the United States, "in aid of proposed legislation affecting the use and disposition of the petroleum deposits in the public domain." This order, which was subsequently ratified and confirmed on July 2, 1910, subject to the provisions, limitations, exceptions, and conditions contained in the act of Congress approved June 25, 1910 (36 Stat. 847), was held in all respects valid by the Supreme Court in February, 1915, in U. S. v. Midwest Co., 236 U. S. 459, 35 Sup. Ct. 309, 59 L. Ed. 673. No discovery of oil had been made on any of the lands at the date of the first withdrawal order, nor was any one in possession thereof at that time actually engaged in work looking to a discovery. In suits 47, A–2, A–3, and A–30 sundry parties had, prior thereto, posted on the land involved in each of the suits and caused to be recorded a notice claiming a location of the land as a petroleum placer mining claim under the mining laws of the United States, but no discovery of oil had been made or any work done thereon, except some so-called assessment work, which consisted in excavating sump holes, building small cabins, and the erection of a couple of derricks on one of the tracts, which derricks were never used or equipped for drilling, but were subsequently taken down and removed to other parts of the premises. After the first withdrawal order, parties claiming as lessees of the so-called locators in the four cases referred to, and in the other two without any previous notice of location, commenced drilling operations in each of the tracts involved in the fall of 1909 or early in 1910, and continued thereafter until the discovery of oil, which they were extracting and disposing of when these suits were commenced against the parties in possession, the so-called locators, the purchasers of the oil, and others.

The bills set out the title of the government, the character of the land, the withdrawal orders, the entry of the defendants in violation thereof, and allege that they are in possession of the property, and extracting the oil therefrom, and disposing of it, to the irreparable damage of the plaintiff. The bills pray for injunctions, decrees, and accounting, as stated. The defendants admit government's title, but assert the right of the locators and the operating companies to the possession of the properties, and to extract and dispose of the oil, under the mining laws of the United States and the act of Congress of June 25, 1910.

[1] In case No. 47 a preliminary question as to the right of the court to consider it on the merits requires attention. On June 1, 1914, a decree was entered dismissing the suit; the court (Judge Dooling) holding that the withdrawal order of September 27, 1909, was invalid

for want of authority in the President to make it. On July 1st following, and within the term, an ex parte order was made by him permitting a petition to rehear to be filed by the government; "the hearing thereon and the decision of the questions therein to be presented to be had upon 10 days' notice, to be issued by the parties or their counsel of record, at a time and place to be fixed by the court." The petition was not served on the defendants, nor any show cause order made. Subsequently, and after the decision in the Midwest Case and after the expiration of the term in which the decree was rendered, the court allowed the petition to rehear, vacated its former decree of dismissal, and reinstated the case, without, as far as the record shows, notice to the defendants or their counsel. The decree of dismissal is pleaded in bar, and it is urged that the order granting the rehearing is void for want of jurisdiction, because made after the expiration of the term at which the decree was rendered and without notice. After a term has ended, all final judgments and decrees of the court pass beyond its control; unless steps be taken during that term, by motion or otherwise, to set aside, modify, or correct them. Bronson v. Schulten, 104 U. S. 410, 26 L. Ed. 797; Wetmore v. Karrick, 205 U. S. 141, 27 Sup. Ct. 434, 51 L. Ed. 745; In re Metropolitan Trust, 218 U. S. 312, 31 Sup. Ct. 18, 54 L. Ed. 1051. But the petition to rehear was filed by permission of the court within the term, and it is settled that, if a petition or motion for rehearing is made in season and entertained by the court, the decree, although entered in form, does not become final or discharge the parties from attendance in the case, and they are bound to follow the petition thus pending to a subsequent term. Equity rule 69 (198 Fed. xxxviii, 115 C. C. A. xxxviii), "that no rehearing shall be granted after the term at which the final decree of the court shall have been entered and rendered," etc., does not apply where a petition to rehear is presented during the term, because the decree of the court does not become final until such petition is disposed of. Giant Pwd. Co. v. Cal. V. Powder Co. (C. C.) 5 Fed. 197; Aspen M. & S. v. Billings, 150 U. S. 31, 14 Sup. Ct. 4, 37 L. Ed. 986.

[2] There is no statute or rule of court of which I am advised requiring a petition to rehear in an equity case to be served on the adverse party unless by order of the court. It is no doubt the better practice, but the failure to do so is not a jurisdictional defect, and does not destroy the efficacy of a petition filed by the consent and in pursuance of an order of the court. Whether it was error to vacate the former decree without formal notice to the defendants does not go to the sufficiency of the decree as a bar. At most it was an error or irregularity in the course of the proceedings in a matter over which the court had jurisdiction, and which I do not feel called upon to consider at this time. The plea in bar will therefore be overruled and denied.

[3] No location of a mining claim, valid as against the government, can be made until the discovery of mineral within the limits of the claim. R. S. §§ 2320, 2329 (Comp. St. 1913, §§ 4615, 4628). Discovery and appropriation are the sources of title. Posting a notice on public land claiming the same as a mining claim, recording such

notice, and doing so-called assessment work, without first making a discovery, is a mere speculative proceeding, conferring no rights as against the government, although as long as the so-called locator remains in possession and with due diligence prosecutes work towards discovery he may be entitled to protection against "all forms of forcible, surreptitious, or clandestine entry and intrusion upon his possession" by another. Erhardt v. Boaro, 113 U. S. 527, 5 Sup. Ct. 560, 28 L. Ed. 1113; McLemore v. Express Oil Co., 158 Cal. 559, 112 Pac. 59; Borgwardt v. McKittrick, 164 Cal. 650, 130 Pac. 417; Tuolumne Con. M. v. Maier, 134 Cal. 583, 66 Pac. 863; and opinion of Judge Bledsoe on application for appointment of receivers in cases A–13 and A–30. It follows, therefore, that the defendants had no right or claim to the properties in controversy, or the mineral contents thereof, valid as against the United States, at the date of the first withdrawal order, since there had been no discovery of oil at that time; nor could any such right be initiated by an entry after the date of such order. Midwest Case, supra.

[4] It is contended, however, that although no discovery had been made at the time of the first withdrawal order, the operating companies or those under whom they claim had, in all of the cases except two, made paper locations and done work on the premises prior to that date, and were bona fide occupants at the time of the first withdrawal order, and in diligent prosecution of work leading to discovery, within the meaning of the saving clause in the act of June 25, 1910. This act declares:

"That the rights of any person who, at the date of any order of withdrawal heretofore or hereafter made, is a bona fide occupant or claimant of oil or gas bearing lands, and who, at such date, is in diligent prosecution of work leading to discovery of oil or gas, shall not be affected or impaired by such order, as long as such * * * claimant shall continue in diligent prosecution of said work."

To come within this provision it is essential that the party claiming the benefit thereof was a bona fide occupant or claimant at the date of the withdrawal, and at that time in diligent prosecution of work leading to a discovery. Now, the evidence shows, and it is undisputed, that the defendants in none of the cases were engaged in the prosecution of work leading to discovery of oil or gas at the date of the first withdrawal order, or in fact doing any work at all. Indeed, no work had been done on any of the tracts for months prior to the order, and then only so-called assessment work, which was of no effect as against the government, since assessment work must follow, and not precede, discovery.

It is urged, however, that they had in good faith signified an intention, by filing and recording notices and doing so-called assessment work, to enter the lands under the mineral laws, and that they would have proceeded with work looking to discovery, but for their inability to obtain water for use in their boilers and for drilling purposes. The lands in controversy are situate in an arid section of the state, and until late in 1909 or early in 1910 it was difficult, if not impracticable, to obtain water in sufficient quantities for successful drilling; but I do not think that fact brings the cases within the terms of the law.

There is no intention manifest in the statute, as far as I can see, to protect or confer any rights on those who had merely made a filing prior to the withdrawal order, but who were unable to engage in work looking to discovery, but only those who were at the date of the order bona fide occupants or claimants of the lands withdrawn and *actually engaged in the diligent prosecution of such work.* None of the defendants comes within this category.

"Diligent prosecution of the work of discovery does not mean the doing of assessment work. It does not mean the pursuit of capital to prosecute the work. It does not mean any attempted holding, by cabin, lumber pile, or unused derrick. It means the diligent, continuous prosecution of the work, with the expenditure of whatever money may be necessary to the end in view." McLemore v. Express Oil Co., supra.

The Supreme Court of Nevada, in Ophir Silver Mining Company v. Carpenter, 4 Nev. 538, 97 Am. Dec. 550, after saying, "Diligence is defined to be the 'steady application to business of any kind, constant effort to accomplish any undertaking,'" adds:

It "is that constancy or steadiness of purpose or labor which is usual with men engaged in like enterprises, and who desire a speedy accomplishment of their designs; such assiduity in the prosecution of the enterprise as will manifest to the world a bona fide intention to complete it within a reasonable time. It is the doing of an act, or series of acts, with all practical expedition, with no delay, except such as may be incident to the work itself."

Now, the mere effort, however diligent, to obtain water for drilling purposes, or the inability to do so, which is all the evidence for the defendants tends to show, cannot be held to constitute diligent prosecution of work looking to discovery any more than the pursuit of capital to prosecute such work, or a lumber pile or unused derrick, can be held to constitute such diligence. The question is not whether the defendants were able to prosecute the work of discovery at the date of the withdrawal order, but whether they were actually engaged in such work at that time.

[5] It is argued that as the withdrawal order of September 27, 1909, was temporary, and "in aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain," its purpose was accomplished, and the implied power of the President to make it exhausted, when Congress acted by passing the act of June 25, 1910, entitled "An act to authorize the President of the United States to make withdrawals of public lands in certain cases," and it became ineffective and ceased to be operative immediately on the passage of such act, and from that time until July 2d, the date of the second withdrawal order, the public lands included in the first order were open to entry under the mineral laws, and as it is admitted that the operating defendants in each of the cases were in possession of the property at the date of the second withdrawal order and engaged in the work of development, their right to the possession was confirmed by the provisions of the act referred to.

There is some force in this argument, but I think it is answered by the language of the act and the decision in the Midwest Case. It was held in the Midwest Case that the President had authority by long

acquiescence of Congress to make the withdrawal order. Consequently such order must be valid and effective until revoked, repudiated, or modified by lawful authority, and that has not been done, at least so far as it affects oil or gas bearing lands. The language of the act as a whole evidences an intention on the part of Congress to leave parties in possession of such withdrawn lands in statu quo; the courts to determine their rights, if any. It provides that it shall not be "construed as a repudiation, abridgment or enlargement of any asserted rights or claims initiated upon.any oil or gas bearing land after any withdrawal of such made prior to the passage of this act." There is nothing in its language, nor can anything be read into it by implication, which indicates an intention to nullify or affect the validity of previous orders withdrawing oil or gas bearing lands. It shows an intention on the part of Congress to regulate withdrawals after its passage and to grant relief to those who were in diligent prosecution of work leading to discovery of oil or gas at the date of previous withdrawal, but nothing therein to indicate the slightest intention to nullify, cancel, or repudiate withdrawals of oil or gas bearing lands already made. In the Midwest Case the locators entered upon the land in March, 1910, bored a well, and discovered oil, and in May following filed a location notice. They were in possession of the property between the passage of the act of June 25, 1910, and the 2d of July, the date of the second withdrawal order, and had actually discovered oil, and yet the court held that they had no right or claim to the property, valid as against the government. The defendants in the cases at bar are in no better position.

It is also insisted that the withdrawal order of September, 1909, did not affect the right to explore for oil in the withdrawn lands, and, after discovery, to extract and dispose of the same, but only the right to enter, locate, or purchase such lands. The language of the order, as well as its history and purpose, clearly negatives such contention. Its manifest object, as its language plainly shows, was to preserve the petroleum in the lands, in order to subserve the public interest as the President then saw it. The lands were valuable only for their mineral contents, and the express purpose of the withdrawal order was to preserve such contents until Congress should provide for their disposition. When the lands were withdrawn, they ceased to be public lands of the United States within the meaning of the mining laws, and hence not open to exploration or discovery under such laws. I conclude, therefore, that in view of the withdrawal order of September 27, 1909, and the Midwest Case, the defendants have no right, title, or interest in or to the property in controversy, or possession thereof, or its mineral contents, which they can successfully assert as against the government, and this brings me to the question of jurisdiction and the relief to which the plaintiff is entitled in these suits.

[6] The defendants stoutly contend that, since the complaints allege and the answers admit that the plaintiff was not, and the operating defendants were, in possession at the time the suits were commenced, the question of title or right to possession cannot be determined by a court of equity, and the only relief to which the plaintiff is entitled in

any event is decrees enjoining the defendants from committing further waste until the title and right of possession can be determined at law, while the position of the government is that, since the defendants were engaged in extracting and removing the oil, and thereby destroying the very substance of the estate, a court of equity has jurisdiction to restrain such operation, and, having acquired jurisdiction for that purpose, will retain it for all purposes.

There is much apparent confusion in the adjudged cases as to when and under what circumstances a court of equity will assume jurisdiction at the suit of a party out of possession to determine title and right to possession of mining property. These questions were considered by Mr. Justice Wolverton in Bishop v. Baisley, 28 Or. 119, 41 Pac. 936, and the doctrine deduced by him from an examination of the authorities may be summarized as follows: Where the title is legal, and not equitable, and is seriously in dispute, a court of equity will not assume jurisdiction by one out of possession, except for a temporary purpose, to abide the adjudication of title by an action at law, and a perpetual injunction will not be granted in such a case, as that would be to try title in a court of equity, when the remedy is purely legal. But where the legal title and right to possession is clear, a perpetual injunction will issue to restrain trespass and waste, and a court of equity will grant such other relief as may be consistent with equity and right. He says:

"The injunctive jurisdiction of courts of equity will be freely exercised to prevent trespass upon mines, as the digging and removing ores therefrom and extracting and disposing of their products reaches to the very substance and value of the estate, and goes to the destruction of the very essence thereof. A continued trespass of such a character would almost inevitably lead to a multiplicity of actions for damages. 2 Beach on Injunction, § 1155. The general rule requiring the plaintiff to come with an uncontroverted legal title extends also to trespass against mines, but is relaxed somewhat in the case of irreparable injury going to the substance of the estate."

And this I take to be the true rule. Where there is a serious controversy as to the title, and the party in possession is holding adversely, the plaintiff's remedy is at law, and not in equity. Johnston v. Corson Gold Mining Co., 157 Fed. 145, 84 C. C. A. 593, 15 L. R. A. (N. S.) 1078. For "suits in equity shall not be sustained in the courts of the United States in any case where a plain, adequate and complete remedy may be had at law." R. S. § 723. But where the title and right to possession is clear, and the defendant is wrongfully in possession, extracting and removing the mineral contents, thus destroying the very substance of the estate, a court of equity will assume jurisdiction to prevent such waste, and, having done so, will determine the rights of the parties before it. It is true the plaintiff in such case has a remedy at law to recover possession and damages for the trespass, but "it is not enough that there is a remedy at law. It must be plain and adequate, or, in other words, as practical and efficient to the ends of justice, and its prompt administration, as a remedy at equity." Payne v. Hook, 7 Wall. 430, 19 L. Ed. 260; Toledo Traction, Light & Power Co. v. Smith (D. C.) 205 Fed. 643; Magruder v. Belle Fourche Valley Water Users' Ass'n, 219 Fed. 72, 133 C. C. A. 524.

Now, in these cases there is no issue tendered as to title. It is admitted that the properties in controversy belong to the government, and that it has the clear legal title thereto. The defendants were either lawfully in possession, with the right to take and remove the mineral contents, or they were trespassers, committing waste by destroying the very substance of the estate. If my conclusion is sound that the defendants have no right of possession or to the oil as against the government, it seems to follow necessarily that the remedy at law would be wholly inadequate to prevent irreparable injury to the estate and practical destruction thereof by the removal of the oil. The lands are admittedly valuable only for their oil contents. The trespasses of the defendants complained of were not ordinarily cases of trespasses of temporary duration. They were continuous, and defendants were destroying, and threatened to continue to destroy, the substance of the estate, and ultimately, if they had been permitted to continue, would have rendered the plaintiff's ownership thereof valueless. As stated by Judge Riner in Big Six Development Company v. Mitchell, 138 Fed. 279, 70 C. C. A. 569, 1 L. R. A. (N. S.) 332:

"Threatened and continuous injuries to mines, quarries, timber growing upon lands, buildings located thereon, or other improvements of a permanent character, are enjoined, because, as has been said, such acts 'alter the character of the property, and also tend to destroy it, and occasion irreparable loss and damage.' * * * In such cases the threatened injuries are to the res, and diminish the value of the property itself, and an injunction will be granted to prevent the continuing waste or continuing trespass, although the plaintiff is not in possession, and although the legal title has not been settled or questioned by an action at law. * * * And having obtained jurisdiction for that purpose, the court may, for the purpose of preventing a multiplicity of suits, retain it for further relief, and may remove a cloud upon the title, quiet the title, and determine the right of possession."

A court of equity, therefore, has jurisdiction to restrain the defendants from destroying the value of the properties in controversy, by extracting and removing the oil therefrom, and will retain the suits for an accounting and satisfaction for the injuries already done. El Dora Oil Co. v. U. S., 229 Fed. 946, —— C. C. A. ——; Graves v. Ashburn, 215 U. S. 331, 30 Sup. Ct. 108, 54 L. Ed. 217; Coosaw Min. Co. v. South Carolina, 144 U. S. 550, 12 Sup. Ct. 689, 36 L. Ed. 537; U. S. v. Flint, 4 Sawy. 78, Fed. Cas. No. 15,121; U. S. v. Guglard et al. (C. C.) 79 Fed. 21; Light v. U. S., 220 U. S. 523, 31 Sup. Ct. 485, 55 L. Ed. 570; Big Six Dev. Co. v. Mitchell, 138 Fed. 279, 70 C. C. A. 569, 1 L. R. A. (N. S.) 332, and authorities there cited; U. S. v. Bernard, 202 Fed. 728, 121 C. C. A. 190; U. S. v. Mackey (D. C.) 214 Fed. 137; Wood v. Braxton et al. (C. C.) 54 Fed. 1005; Peck v. Ayers & Lord Tie Co. et al., 116 Fed. 273, 53 C. C. A. 551; U. S. v. Brighton Ranche Co. (C. C.) 26 Fed. 218.

In most of the cases there are substantially three classes of defendants: (1) The parties who drilled wells in the properties in controversy, and extracted and marketed the oil therefrom, and were threatening to continue to do so, known as the operating companies; (2) the alleged locators, under whom the operating companies claim; and

(3) the parties who purchased the oil after it had been extracted, who may be designated as the marketing defendants.

[7] As to the latter, the suits are nothing in effect but actions for conversion of property alleged to have been wrongfully taken from the lands by the operating companies. The marketing companies make no claim to the properties, have never trespassed, nor committed waste therein, nor advised or encouraged others to do so. Their only offending consisted in purchasing the oil in the usual course of business, as they did from many other operators in the same field. They are no doubt amply able to respond to any judgment the government may recover against them, and for the wrong, if any, done by them, the plaintiff has a plain, adequate, and complete remedy at law, and they cannot be denied their constitutional right to trial by jury by joining them with defendants in a suit to prevent waste brought against the operating companies. There is no question here of following the proceeds of property converted into other property, but simply an action to recover of the marketing companies the value of the oil purchased by them from the actual trespassers. Nor is there an accounting necessary between them and the government in any such sense as to give a court of equity jurisdiction on that ground. The suits, therefore, will be dismissed as to the marketing companies, without prejudice, however, to the rights of the government to sue at law, if it should so elect. U. S. v. Bitter Root Co., 200 U. S. 451, 26 Sup. Ct. 318, 50 L. Ed. 550.

The cases against the operating defendants must go to a master to ascertain and report the amounts, if any, the plaintiff is entitled to recover against them. It is proper, therefore, that the court should indicate the rule by which, in its judgment, the master should be governed in his consideration of the matter. For the government it is contended that the operating companies must be treated as willful trespassers, and required to account to it for all oil extracted at its market value, with no deductions whatever for money expended for sinking wells, or otherwise developing and improving the properties, or for the cost and expenses of extracting and marketing the oil, and that in addition it is entitled to take and appropriate all wells, casings, derricks, machinery, tools, and appliances and other property put on the lands by the defendants. This view does not favorably address itself to a court of equity. Equity seeks compensation for the wrong done, and not to punish the wrongdoer. Turner v. Seep (C. C.) 167 Fed. 652. As said by Judge Gilbert in United States v. Bernard, 202 Fed. 732, 121 C. C. A. 190, which was a suit to enjoin trespass on government land and for damages:

"In actions of trespass, where the injury is wanton or malicious, or gross and outrageous, or is done against the protest of the plaintiff, or in known violation of the law, the court may permit the jury to add to the measured compensation of the plaintiff further damages by way of punishment or example, the amount thereof to be left to the jury's discretion, in view of the special, peculiar circumstances of the case. But the function of a court of equity goes no farther than to award, as incidental to other relief, or in lieu thereof, compensatory damages. It has no authority to assess exemplary damages. By applying to a court of equity for relief, the complainant waives all claims to vindictive damages."

[8] The government could have proceeded against the defendants in ejectment, or in trespass, or for a conversion, in which event the rules applicable at law would have been available; but it has seen fit to invoke the aid of a court of equity, and, having done so, its rights must be determined on equitable principles, the same as that of any other litigant. Where the sovereign comes into a court of equity, asserting a pecuniary demand against a citizen, or to protect its proprietary interest, its claims appeal, generally speaking, to the conscience of the chancellor with the same, but no greater or less, force than that of a private individual under like circumstances, and it is the duty of the court to withhold relief, except upon the terms which do justice to the citizen or subject, as determined by the jurisprudence of the forum. Sweet v. U. S., 228 Fed. 421, —— C. C. A. ——, and authorities cited; Walker v. U. S. (C. C.) 139 Fed. 409; U. S. v. Detroit Lumber Co., 200 U. S. 321, 26 Sup. Ct. 282, 50 L. Ed. 499; Hemmer v. U. S., 204 Fed. 898, 123 C. C. A. 194; Iowa v. Carr, 191 Fed. 257, 112 C. C. A. 477. For, as said by Mr. Justice Severens, speaking for the court in United States v. Chandler Dunbar Water Power Co., 152 Fed. 41, 81 C. C. A. 221:

When it (the sovereign) "sues in equity as a private suitor on a cause of action relating to its proprietary interests, it is held to be affected by those equities which are recognized as fundamental in controversies between private parties. And why should this not be so? It derogates from the dignity and character of the government to suppose that, formed as it is to secure impartial justice between individuals, it may nevertheless, in the conduct of its own affairs, without regard to the principles it represents, perpetrate upon its citizens wrongs which it would promptly condemn if practiced by one of them upon another."

It is therefore unnecessary to examine the numerous cases cited discussing when a trespass upon land will be regarded as innocent or willful, or the measure of damages in an action at law therefor, or to attempt to reconcile the apparent conflict in the opinions, or to deduce any general rule therefrom, because these suits are to be decided upon principles of justice, right, and fair dealing, under all the facts, and not according to the strict rules applicable to actions at law.

[9] Now, in four of the cases the parties under whom the operating companies entered claimed a right to the possession of the property involved and to extract the oil therefrom because of attempted locations made prior to the withdrawal order, or under contracts with such locators. In Case No. A–30 the land in controversy was, at the date of the first withdrawal order, covered by a homestead entry; but, as the adjoining lands were rapidly being developed as mineral, the entryman concluded that he could not sustain his title, and therefore permitted the operating defendants to enter into possession and prospect for oil. At the time of the withdrawal order, or soon thereafter, the area in the immediate vicinity of the properties in controversy was being rapidly developed as oil-producing property. It was therefore necessary for the claimants, if they were to protect their rights, if they had any, to take immediate steps to develop the property claimed by them, in order to prevent its occupation by others, or the oil under it from being drawn off and exhausted by wells on adjoining land. They

thereupon, acting as prudent and careful men, consulted counsel learned in the law, and were advised that, since Congress is vested by the Constitution with power to dispose of the public land (article 4, § 3), and since it had declared by statute that valuable mineral deposits, including petroleum, in land belonging to the United States, are free and open to exploration and purchase, and the land in which they are situate to occupation and purchase (R. S. §§ 2319–2329; Act Feb. 11, 1897, c. 216, 29 Stat. 526 [Comp. St. 1913, § 4635]), the Executive was without authority to suspend the acts of Congress, or withdraw the lands from the operative effect thereof, and therefore the withdrawal order was invalid, and if they proceeded to a discovery of oil, they would acquire a right to the property and its contents.

Acting on this advice, honestly and in good faith, without any intention of wronging the government, they developed the properties, expending large sums of money in so doing, the aggregate in the six cases in question amounting to more than $1,000,000. By their labor and expenditures they have demonstrated the mineral character of the lands, and increased their market value from $2 or $3 an acre to $2,000 or $2,500 an acre. What was before a barren, arid waste is now demonstrated valuable mining properties, with numerous oil-producing wells thereon, and that through the efforts and expenditures of the defendants. The government agents and officers charged with the disposition of the public lands knew of the possession and development of the properties, and made no objection thereto, and while this does not estop the government from now asserting title or right to the possession (Pine River Logging Co. v. U. S., 186 U. S. 279, 22 Sup. Ct. 920, 46 L. Ed. 1164), it should not be overlooked by a court of equity in considering the character of the defendants' possession, or the damages which they should be required to pay. .

It is true the defendants, as laymen, are presumed to have known the law, and that the withdrawal order was valid, although many of the leading members of the California bar, and five of the ten federal judges called upon to consider the question judicially, apparently did not, and even the Executive himself was in doubt as to his authority to make the order. The maxim that every man knows the law applies to defendants, but there is a marked difference between those who recklessly, or with actual intent to rob others, trespass upon their property, and those who, acting on the advice of counsel, trespass by mistake, with no evil purpose, but with an honest belief that they have a right to do so. "One who acts in good faith, upon the erroneous advice of reputable counsel upon questions of legal right concerning which a layman could hardly have actual knowledge, is not chargeable with bad faith, or with a willful intent to commit a wrongful act because his counsel was mistaken in his view of the law." U. S. v. Homestake Min. Co., 117 Fed. 481, 54 C. C. A. 303; U. S. v. St. Anthony R. R. Co., 192 U. S. 524, 24 Sup. Ct. 333, 48 L. Ed. 548; U. S. v. Mullan Fuel Co. (D. C.) 118 Fed. 663. The defendants were not willful looters of the public domain, nor reckless trespassers thereon. They acted on the advice of reputable counsel, expended their money and labor in good faith, relying upon a law of the United

States and in the honest belief that they were within their rights. They were of course trespassers, because they were mistaken, but they should not be mulcted in damages beyond the actual loss to the government, and in my opinion this should be measured by the value of the oil taken and the damages, if any, which they have caused or permitted to the properties or their oil contents by the infiltration of water or otherwise.

The value of the oil taken is to be ascertained by its market value at the time it was used or disposed of by the defendants, less the cost of extracting and marketing the same, excluding from such costs the work of sinking wells, development or improvement, or in discovering or reaching the oil. Hall v. Abraham, 44 Or. 481, 75 Pac. 882. In Turner v. Seep (C. C.) 167 Fed. 650, and other cases (see Dartmouth College v. Paper Co. [C. C.] 132 Fed. 92), the courts have held that the damages to be recovered from an innocent trespasser on mineral land is the value of the mineral in the ground at the time it was taken, determined by the usual and customary royalty its production would have afforded the owner. This result depends to some extent on the form of the action, and so far as I have been able to ascertain in most of the cases in which this rule has been applied the defendants were either in possession claiming under the owner or through inadvertence or mistake. Here the possession was intentional and without the consent and against the will of the government, and therefore the defendants should not be permitted to reap a profit from their transaction. U. S. v. Hammond (D. C.) 226 Fed. 849. They should be allowed, however, to set off against the damages properly chargeable to them the value of any permanent and useful improvements to the property made by them, such as producing wells, permanent buildings, and the like, and should be permitted to remove from the premises all tools, boilers, engines, and other movable machinery or equipment which they placed thereon during their occupation thereof.

The properties have been for some time and are now being operated by a receiver, and the oil extracted by him should be awarded to the complainant; but if he has used or is now using any tools, appliances, or equipment belonging to the defendants, he should be required to account to the owner for the fair value of such use, and for the value of such parts thereof, if any, which have been consumed, destroyed, or worn out by him, and the defendants should not be charged with any part of the compensation or expenses of the receiver, or the costs of these suits. Midland Oil Co. et al. v. Turner, 179 Fed. 74, 102 C. C. A. 368.

[10] It is claimed on behalf of the defendants that the doctrine announced by Justice Story in Bright v. Boyd, 1 Story, 478, Fed. Cas No. 1,875, and followed in many subsequent cases, that where an occupant of land in good faith under color of title has by his improvements added to the permanent value of the estate, he is entitled to be reimbursed therefor before a court of equity will restore the absolute owner to the possession thereof, and hence the government should be required to reimburse the defendants for the value of the producing wells drilled on the properties by them, or other permanent improve-

ments put thereon, before it is awarded possession. But this position is, I think, untenable. The defendants did not enter or hold under color of title or in good faith within the meaning of the rule referred to, for as said by Mr. Justice Field in Deffeback v. Hawke, 115 U. S. 407, 6 Sup. Ct. 95, 29 L. Ed. 423:

"There can be no color of title in an occupant who does not hold under any instrument, proceeding, or law purporting to transfer to him the title or to give to him the right of possession. And there can be no such a thing as good faith in an adverse holding, where the party knows that he has no title, and that, under the law, which he is presumed to know, he can acquire none by his occupation."

The defendants drilled the wells in question, and made the other improvements with full knowledge of the withdrawal order and of all the facts in the case, and while they acted under an honest belief they had the right to extract the oil, they were nevertheless trespassers, and are not entitled to be recompensed by the government for the money expended in developing the properties in excess of the amount of its claim against them. The lands were included in the withdrawn area to preserve them intact and undeveloped, pursuant to a governmental policy to conserve their mineral contents for such future use and disposition as to it might seem proper. This purpose has been interfered with by the opening up of the oil reservoirs by the defendants, so that in many, if not all, instances it is now necessary to continue to operate the wells and extract the oil, or lose it entirely. The government should not be required to pay for improvements so made without its consent and against its expressed will. The proposition that the defendants cannot be required to surrender possession until they have been reimbursed for permanent improvements is not within the reason of the rule that one who seeks equity must do equity. U. S. v. Trinidad Coal & Coking Co., 137 U. S. 160, 11 Sup. Ct. 57, 34 L. Ed. 640.

In order, however, that all questions of accounting may, if possible, be settled in one hearing, the master will be directed to ascertain and report, in addition to the matters necessary for an accounting in accordance with the views heretofore expressed, the reasonable cost and expense of drilling the several wells producing, or capable of producing, at the time the receiver took charge, and of all wells, if any, partly drilled at that time and subsequently completed by the receiver, and any other permanent and valuable improvements put upon the property, and the usual and customary royalty value of oil in place, if any such value existed at the time of the trespass.

It is insisted that suit No. A–31 is barred by section 2332, Revised Statutes (Comp. St. 1913, § 4631), which provides that where a person or association of persons, or "their grantors, have held and worked their claim [mining] for a period equal to the time prescribed by the statute of limitations for mining claims of the state or territory where the same may be situated, evidence of such possession and working of the claims for such period shall be sufficient to establish a right to a patent thereto under this chapter, in the absence of any adverse claim." This is not a statute of limitations. It is a part of the chapter on Mineral and Mining Resources, and prescribes the evidence sufficient to

establish the right of one who has possessed and worked a mining claim to a patent. It necessarily assumes that the lands were open to entry and patent under the mining laws. And while, as said by the Supreme Court in Reavis v. Fianza, 215 U. S. 25, 30 Sup. Ct. 1, 54 L. Ed. 72, construing a similar provision, the "right to an instrument that would confer title in a thing is the right to have the thing," it manifestly can have no application to a trespasser on land the title to which cannot be acquired under the law of the United States. The defendants' entry and possession was after the withdrawal order, and initiated no rights as against the government which could ripen into a title or a right to a patent.

Decree may be prepared accordingly.