UNITED STATES of America,
Plaintiff-Appellant,

v.

CONSOLIDATED MINES & SMELTING CO., LTD., & Hugh Brown,
Defendants-Appellees.

UNITED STATES of America,
Plaintiff-Appellee,

v.

CONSOLIDATED MINES & SMELTING CO., LTD., et al., and Hugh Brown,
Defendants-Appellants.

Nos. 25164, 25241.

United States Court of Appeals,
Ninth Circuit.

Dec. 6, 1971.

Rehearing Denied Dec. 12, 1971.

Raymond N. Zagone (argued), Dept. of Justice, Washington, D. C., Shiro Kashiwa, Asst. Atty. Gen., S. Billingsley Hill, Washington, D. C., Dean C. Smith, U. S. Atty., Robert M. Sweeney, Asst. U. S. Atty., Spokane, Wash., for the United States.

William C. Harrison (argued), Spokane, Wash., for Consolidated Mines and others.

Before JERTBERG and CARTER, Circuit Judges, and LUCAS*, District Judge.

JAMES M. CARTER, Circuit Judge:

This case concerns mining claims on an Indian reservation. Our decision breaks new ground in holding that the doctrine of exhaustion of administrative remedies does not require completion of appellate or review proceedings within the agency. The decision also considers the effect of a withdrawal of Indian lands from entry and disposal under the Land and Mining laws of the United States, and holds that revocation of withdrawals may not be accomplished by circumstances or procedures less formal than those attending the withdrawal. The decision also considers questions of estoppel against the government, adverse possession and the effect of relocations of prior located mining claims.

There were six decisions by the Department of the Interior considered by Chief Judge Powell in well written district court opinions. On the authority of the opinion filed on June 28, 1968, and the portion of the supplemental opinion relating to the first five claims filed on December 18, 1968, we affirm the district court in its action as to the first five decisions of the Department of the Interior.

We set forth hereafter, and adopt the opinion of June 28, 1968, and a portion of the supplemental opinion of December 18, 1968.

Following the opinions we add a few words as to some of the aspects of the case, and then consider the district court's actions as to decision No. 6 of the Department of the Interior, reverse the judgment as to Decision No. 6 and remand to the district court on that matter.

United States District Court
Eastern District of Washington
Northern Division

| | |
|---|---|
| United States of America,<br><div align="right">Plaintiff,</div><br>vs.<br>Consolidated Mines & Smelting Company, Ltd., a Corporation, and Hugh Brown,<br><div align="right">Defendants.</div> | Civil No. 2412<br><br>OPINION |

The United States as trustee seeks to quiet title to lands within the diminished Colville Indian Reservation. The defendant, Consolidated Mines & Smelting Co.,

* Honorable Malcolm Lucas, United States District Judge, Central District of California, sitting by designation.

Ltd. (Consolidated), asserts fifty-six mining claims on the land.

Consolidated's mining claims were declared null and void by six decisions of the Department of the Interior.[1] The initial determinations in decisions 1, 2, 3 and 6 were made unilaterally by the Spokane Land Office manager. No "contest proceedings" were held. (Contest proceeding is Interior Department terminology for adjudicative processes within the department, which include hearings.) The initial determinations in decisions 4 and 5 followed contest proceedings. Decisions 1 and 2 were appealed through the Secretary of the Interior. Decisions 3, 4 and 5 were appealed through the Director, Bureau of Land Management (a branch of the Interior Department). Decisons 3, 4 and 5 were not, however, appealed to the Secretary. Decision 6 was not appealed from the land office manager to the Director. Decisions 1, 2, 3 and 6 invalidated certain claims because they had been located after the reservation had been withdrawn from entry under the mining laws by order of the Secretary of the Interior. Decisions 4 and 5 held that certain claims were not supported by valid discoveries.

The records in decisions 1, 2 and 5 are before the Court. The records in decisions 3, 4 and 6 are not. These three records were not offered because the Court previously entered a summary judgment affirming decisions 3, 4, 5 and 6. Summary judgment was granted on the ground that Consolidated's failure to take administrative appeals was a failure to exhaust administrative remedies which precluded judicial review. The record in decision 5 was received in evidence when Consolidated alleged lack of notice of the Director's decision and a tary.

In order to determine the issues in this case it is necessary to review the history of the Colville Indian Reservation. It was carved out of the public domain by President Grant's Executive Order of July 2, 1872. In 1892 Congress restored what is commonly referred to as the "northern half" of the Reservation to the public domain. Act of July 1, 1892, 27 Stat. 62. Title to the southern half, the "diminished Colville Indian Reservation," remained in the government for the use and occupancy of the Indians. 27 Stat. 62, 64 (1892); Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962).

By Act of July 1, 1898, 30 Stat. 593, Congress opened the diminished Reservation to mineral entry. By Act of March 22, 1906, 34 Stat. 80, disposition of unallotted lands on the Reservation was authorized.[2] Proceeds of disposition were to be held by the government for the credit of the Colville Tribe. These openings did not restore lands on the diminised Reservation to the public domain. Seymour v. Superintendent, *supra*. See Ash Sheep Co. v. United States, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920).

The next legislation affecting the Reservation was the Wheeler-Howard Act of June 18, 1934, 25 U.S.C. § 461 et seq.

---

1. Decision 1 invalidated the Majestic and Marvel claims.

 Decision 2 invalidated claims known as Sunset, Sunrise, Chloride No. 5, Porphyry, Parvenue, Golden Eagle, Imperial, Imperial Amended, Peerless, Peerless Amended, Hiawatha, Lucky Strike, Gold King and Blue Bird.

 Decision 3 invalidated the Surprise Fraction claim.

 Decision 4 invalidated Surprise No. 2, Silver No. 1, Surprise No. 1, Surprise No. 3, Tip Top and Bromide.

 Decision 5 invalidated Silver Pride, Reliance, Silver Crest, Pioneer, Dependable, Hot Shot, Silver Pride No. 2, Wenatchee, Red Wing, Lady Luck, Betty Jane, Whispering Pines, Chloride No. 2 Amended, Chloride No. 2, Chloride No. 3, Chloride No. 4, Theodore Roosevelt, James A. Garfield, Ulysses S. Grant, Rutherford B. Hayes, Zachary Taylor, Martin Van Buren, Wm. McKinley, Grover Cleveland, Benjamin Harrison Fraction, James Buchanan and Chester A. Arthur.

 Decision 6 invalidated Silver King, Fluorescent and Silver Pride.

2. This Act was implemented by a 1916 Presidential Proclamation, 39 Stat. 1778.

(now commonly referred to as the "Indian Reorganization Act"). According to its title, one of the purposes of this Act was to "conserve and develop Indian lands and resources." Section 3 of the Act, 25 U.S.C. § 463, authorized the Secretary of the Interior "to restore to tribal ownership the remaining surplus lands" which were formerly part of an Indian reservation but which had been open to disposal by the United States under any of its public land laws. It was provided that "valid rights or claims of any persons to any lands so withdrawn existing on the date of the withdrawal shall not be affected by this Act." *Ibid.*

Shortly after approval of the Indian Reorganization Act the Commissioner of Indian Affairs recommended a temporary withdrawal of certain Indian lands from entry and disposal under the land and mining laws. The remaining surplus lands on the Colville Reservation were included in this recommendation. A month later, Secretary Ickes ordered the withdrawal. This order is set forth in Restoration of Lands Formerly Indian to Tribal Ownership, 54 I.D. 559 (1934). The order provides in part as follows:

> " * * * all undisposed-of lands of the Indian reservations named above that have been 'opened,' or authorized to be 'opened,' to sale, entry, or any other form of disposal under the public land laws, or which are subject to mineral entry and disposal under the mining laws of the United States, * * * be temporarily withdrawn from disposal of any kind, subject to any and all existing valid rights, until the matter of their permanent restoration to tribal ownership, as authorized by Section 3 of the Act of June 18, 1934, *supra* [the Indian Reorganization Act], can be given appropriate consideration."

(Hereinafter this order will be referred to as the "Ickes withdrawal.")

The Ickes withdrawal order has not been formally revoked either by the Executive or by Congress. Section 18 of the Indian Reorganization Act, 25 U.S.C.

§ 478, provided that the Act would not apply to any reservation on which a majority of the adult Indians voted against it. On April 6, 1935 a majority of the Colville Tribe voted against application of the Act. Thus the restoration of these lands to tribal ownership as contemplated by the Ickes withdrawal was frustrated. But by Act of July 24, 1956, 70 Stat. 626, Congress restored the surplus lands on the reservation to tribal ownership. Congress thus overrode the Tribe's rejection of the Indian Reorganization Act.

In support of its action to quiet title, the government relies upon these six Interior Department decisions. In opposition, Consolidated claims: 1) The Ickes withdrawal is invalid and ineffective; 2) A letter and enclosures from the Interior Department misled the corporation and estops the government; 3) It's claims have been perfected by adverse possession, and 4) Some of its location notices filed after the withdrawal are really relocation notices which relate back to a time prior to the Ickes withdrawal and remain unaffected by that order.

I

*Exhaustion Of Administrative
Remedies*

Summary judgment was entered against the claims in decisions 3, 4, 5 and 6. On motion for reconsideration because of lack of notice of the Director's decision, the claims invalidated in decision 5 were taken under advisement after trial. The summary judgment was based on failure to take administrative appeals.

It is established doctrine that administrative remedies must be exhausted prior to judicial review of administrative action. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938). But some care must be taken to distinguish between the different fact patterns to which the doctrine has been applied. Judicial relief is commonly withheld when a party seeks

to have an administrative question litigated before it is administratively considered. The doctrine of primary jurisdiction, often indistinguishable from the doctrine of exhaustion, is said to apply. See generally 3 Davis, Administrative Law § 19.01 (1958). Attempts to obtain review of interlocutory administrative decisions while the administrative process continues are often frustrated by the doctrine of exhaustion of administrative remedies. See generally 3 Davis, *supra,* at § 20.05. The exhaustion doctrine also supports the general rule that a court reviewing agency action will not consider issues not raised before the agency. See Part II, *infra.* See generally 3 Davis, *supra,* at § 20.06.

The general rule under the exhaustion doctrine is that failure to appeal an administrative decision to higher administrative authority precludes judicial review. This rule was formulated in United States v. Sing Tuck, 194 U.S. 161, 24 S.Ct. 621, 48 L.Ed. 917 (1904) in which an alien failed to appeal an exclusion order to the Secretary of Commerce and Labor. The rule laid down in *Sing Tuck* has been consistently followed. See, e. g., Chicago M., St. P. & P. R. Co. v. Risty, 276 U.S. 567, 48 S.Ct. 396, 72 L.Ed. 703 (1928); First National Bank of Greeley v. Board of Commissioners of Weld County, 264 U.S. 450, 44 S.Ct. 385, 68 L.Ed. 784 (1924); Prentis v. Atlantic Coast Line, 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908); Davis v. Nelson, 329 F.2d 840 (9th Cir. 1964) (semble); Donato v. United States, 302 F.2d 468 (9th Cir. 1962). It was in reliance on this rule that summary judgment was granted against the claims included in decisions 3, 4, 5 and 6. Additional research, however, has convinced the court that the rule in *Sing Tuck,* still generally followed, was abrogated insofar as it might apply to this case, in 1946 by section 10

(c) of the Administrative Procedure Act (APA), 5 U.S.C. § 704.

Section 10(c) reads in part as follows:

"Actions Reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review * * *. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority."

As Professor Davis says, "This provision has been almost completely ignored in judicial opinions on the various aspects of the exhaustion problem." 3 Davis, *supra,* § 20.08 at 101. See, e. g., Davis v. Nelson, *supra;* Donato v. United States, *supra.* Professor Davis continues by noting that this subsection "seems to change the law substantially with respect to * * * administrative appeals." *Ibid.*[3] There is some doubt that Congress intended to depart so drastically from decisional law. Representative Walter, Chairman of the House subcommittee which drafted the Act, remarked that "the provisions of this section are technical but involve no departure from the usual and well-understood rules of procedure in this field." Proceedings in the House of Representatives, May 24, 25, 1946, S.Doc.No.248, 79th Cong., 2nd Sess. at 369 (1946). But whether or not a significant departure was intended, there appears to be little doubt that Congress intended to declare that failure to appeal administrative decisions to higher administrative

---

3. The desirability of this change is questionable. It appears desirable to give highest agency authority an opportunity to formulate policy and rules before the courts are required to act. See Hills v.

Eisenhart, 156 F.Supp. 902 (N.D.Cal. 1957), aff'd, 256 F.2d 609 (9th Cir. 1958), cert. den., 358 U.S. 832, 79 S.Ct. 53, 3 L.Ed.2d 70, reh'g den., 358 U.S. 914, 79 S.Ct. 228, 3 L.Ed.2d 235.

authority would not preclude judicial review.[4] "The last clause [permits] agencies to require by rule that an appeal be taken to superior agency authority before judicial review may be sought." S. Rep.No.752, 79th Cong., 1st Sess. (1945); H.Rep.1980, 79th Cong., 2nd Sess. (1946). The reports are printed in S.Doc.No.248 at 213, 217 (1946). The factual background for Congressional consideration of administrative practices was provided by studies conducted by the Attorney General's office. That office also contributed to Congressional evaluation of the APA. Its conclusions parallel those of Professor Davis.[5]

Thus it appears that the portion of the exhaustion doctrine in United States v. Sing Tuck, 194 U.S. 161, 24 S.Ct. 621, 48 L.Ed. 917 (1904) and pertinent here, has been abrogated by section 10(c) of the APA. The meaning of the statute clearly appears: Intra-agency appeals are not a prerequisite to judicial review except to the extent statutes or appropriate agency rules command otherwise.

■ Section 10(c) embodies two exceptions to the general rule of reviewability. The rule does apply to the extent an agency's governing statutes determine finality. No statute purports to determine the finality of decisions of the Bureau of Land Management or the Department of the Interior. Second, the agency may require appeal by rule if it

also provides that the decision appealed from remains inoperative pending appeal. Decisions 3, 4, 5 and 6 were rendered between February 1958 and March 1961. The relevant rules are the one in force at the time of the agency decisions. These rules are set forth in 43 C.F.R. §§ 221 et seq. (1963) (superseded). Most of these rules were promulgated in 21 F.R. 1860 et seq. (1956) and remained unchanged throughout the administrative proceedings in this case. After perusal of them the Court finds none which require appellate type proceedings except 43 C.F.R. § 221.76(c) (1963). This rule permits the Director to designate contests in which the hearing examiner shall make only a "recommended decision." Decisions 3, 4 and 5 were appealed to the Director. Decision 6 was not designated for "recommended decision" under this rule. The rule is therefore not applicable here.

It follows that decisions 3, 4, 5 and 6 are judicially reviewable. The earlier summary judgment sustaining the Department's invalidating of the claims included within decisions 3, 4, 5 and 6 is vacated.

## II

### Absence of Administrative Hearings

Decisions 1, 2, 3 and 6 were rendered without hearings. In decision 2 the Department declared that "contest proceed-

---

4. This statement must be qualified with the exceptions set forth in § 10(c) itself, discussed *infra*.

5. "The last clause of section 10(c) relates to two situations. First, pursuant to section 8(a), an agency may permit its hearing examiners to make initial decisions which will become the agency's final decisions in the absence of an appeal to or review by the agency. The last clause of section 10(c) permits an agency to require *by rule* that in such cases parties who are dissatisfied with the 'initial' decisions of hearing officers must appeal to the agency before seeking judicial review, but only if the agency further provides that the hearing officers' decisions shall be inoperative pending such administrative apeals. * * * (Emphasis in original.)

"The second and similar application of the last clause of section 10(c) relates to appeals from agency decisions to a superior agency authority. For example, under some circumstances, it would seem that a bureau or other subdivision within an agency may itself be the agency with respect to a particular function. In such a situation, it may be desired to require appeal from the bureau's decision to the department head or other 'superior agency authority' as a prerequisite to judicial review. Under section 10(c), such a requirement may be imposed, but only, as in the case of required appeals from hearing officers' initial decisions, if the agency's decision is inoperative pending such appeal." Atty. Gen's. Manual on the Administrative Procedure Act 104, 105 (1947).

ings" (proceedings before hearing examiners) were unnecessary when mining claims were invalidated for location subsequent to a withdrawal. This appears to be the Department's position respecting decisions 1, 3 and 6 as well.

Under slightly different circumstances the Department's position might be acceptable. Both the withdrawal order and Consolidated's mining location notices are matters of public record. If the existence, validity and date of the withdrawal order and the date of Consolidated's location notices were the only facts in issue, some type of summary adjudication would be in order.

■■ But Consolidated claimed that some of its location notices were actually relocation notices. This contention was dismissed by the Department with the observation that relocation is necessarily adverse to the interests of prior locators. Thus, the Department concluded, Consolidated's rights in its mining claims must date from the "relocation" notices filed after the withdrawal. This generalization is correct only if the relocator claims against, rather than through, the prior locator. If a relocator claims through the prior locator, ordinarily the relocation notice relates back. See part IV, *infra*. The evidence before the Department did not indicate whether Consolidated claimed through or against its predecessors. Thus the Department's generalization is supported only by an unjustifiable assumption of fact. Accepting arguendo Consolidated's status as a relocator, hearings would have been desirable to ascertain the relationship between Consolidated's relocations and prior locations made by persons through whom Consolidated claimed.

Given a disputed issue of fact, hearings were required before the Department could declare Consolidated's claims null and void. In Adams v. Witmer, 271 F.2d 29, 32–33 (9th Cir. 1959), relying on Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), the court declared:

"The restrictions of that Act [the Administrative Procedure Act] with respect to the hearings, the proper presiding officers, and the methods of procedure within the agency itself, as prescribed in §§ 7 and 8 are made mandatory by § 5 'in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing.' There is no such statute relative to hearings such as that here involved. But as the appellant's right to his mining claims was a property right, it follows that the requirements of due process necessitate that he have a hearing before he can be deprived of that property right. This constitutional requirement is no less mandatory than would be a mere statutory requirement for hearing."

It follows that the Bureau erred in decisions 1, 2, 3 and 6 when determinations were made without hearings.

But it does not follow that the administrative determination should be upset. In Adams v. Witmer, the court ended by holding that the appellant's failure to object to an irregular hearing, before either the manager or the Bureau, waived the objection. This decision was reached even though the court recognized that the appellant may have been prejudiced. A waiver was also found in United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952) because hearing irregularities had not been raised until a judicial hearing on the merits. These cases exemplify the corollary of the exhaustion doctrine which precludes judicial consideration of issues not presented to administrative agencies. The rule is not inflexible. Leedom v. IBEW, 107 U.S.App.D.C. 357, 278 F.2d 237 (1960).

■ Decisions 1 and 2 were considered by the Land Office Manager, Director and Secretary. The absence of hearings was not raised at any stage of the proceedings. In fact the point has not even been raised in this court; the court is considering it on its own motion. Some evidence was adduced on the relocation

issue at the trial. It was not sufficient to suggest that injustice would result were decisions 1 and 2 upheld. Under these circumstances the court will not reverse decisions 1 and 2 for lack of administrative hearings. Any objection to this defect in decisions 1 and 2 has been waived by Consolidated. The records in decisions 3 and 6 are not yet before the court. A determination on this point with respect to those decisions will await submission of the records. (See Part VIII *infra.*)

### III

#### *The Ickes Withdrawal*

Consolidated questions the validity and efficacy of the Ickes withdrawal. The specific contentions are (1) that the withdrawal was invalid for lack of notice; (2) that it was invalid for lack of authority; and (3) that it became *functus officio* after the April 6, 1935 vote of the Colville's which rejected the Indian Reorganization Act.

■ The court finds no merit in Consolidated's first contention. It appears that the withdrawal was "of record" at the local land office. It is difficult to imagine what other publicity would have been appropriate at the time this order was promulgated. The Federal Register Act, 44 U.S.C. § 301 et seq. was not enacted until July 26, 1935. Publication of new laws in newspapers was stopped by an 1874 Act, 44 U.S.C. § 321.

A number of Consolidated's claims were located after the withdrawal but before the Colvilles rejected the Indian Reorganization Act.[6] In connection with these claims Consolidated contends the Secretary lacked authority to make the withdrawal.

Section 13 of the Act of June 25, 1910, as amended, 43 U.S.C. § 148 gave the Secretary power to withdraw Indian lands for irrigation projects. Section 1 of the Pickett Act, 43 U.S.C. § 141, confirms the President's power to withdraw public lands but declares that all land withdrawn under the Act shall remain open to mineral entry. The Ickes withdrawal was not authorized by either statute. The withdrawal was not for irrigation purposes. Nor does it appear to be a withdrawal of public land. The Reservation lands were "Indian trust lands" as opposed to "public lands" which might be withdrawn under the Pickett Act. See Ash Sheep Co. v. United States, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920); Memorandum, Mining Locations On Colville Surplus Lands, 60 I.D. 318 (1949). In any event, the Ickes withdrawal could not be sustained under the Pickett Act because that Act requires that withdrawn lands remain open to mineral entry.

In law, the Secretary's withdrawal is an act of the President. At present this relationship is explicit. Executive Order No. 10355, May 26, 1952, 17 F.R. 4831, superseding Executive Order No. 9337, April 24, 1943, delegated the President's power to withdraw land under the Pickett Act or other authority to the Secretary. Even before this delegation the Secretary's withdrawals were considered acts of the President. Wolsey v. Chapman, 101 U.S. (XI Otto) 755, 25 L.Ed. 915 (1879); Wilcox v. Jackson, 38 U.S. (13 Pet.) 498, 513, 10 L.Ed. 264 (1839).

No judicial authority has been cited to the court, or found, sanctioning a non-statutory power in the Executive to withdraw Indian trust lands from mineral entry. The Interior Department, however, maintains that this power exists. Memorandum, Mining Locations On Colville Surplus Lands, 60 I.D. 318 (1949). Whether or not such a power might have initially been said to exist, it has often been exercised. The question of its present existence is resolved by analogy to United States v. Midwest Oil Co., 236 U.S. 459, 474, 35 S.Ct. 309, 313, 59 L.Ed. 673 (1915). In that case the power of the Executive to withdraw lands within

---

6. This category includes the Sunset, Sunrise, Chloride No. 5, Porphyry, Parvenue, Golden Eagle, Imperial, Imperial Amended, Peerless, Peerless Amended, Gold King and Blue Bird claims invalidated in decision 2 and the Surprise Fraction claim invalidated in decision 3.

the public domain was challenged. The court was able to find no initial source for the power exercised, but held that:

" * * * the long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the withdrawals had been made in pursuance of its consent or of a recognized administrative power of the Executive in the management of the public lands. This is particularly true in view of the fact that the land is property of the United States, and that the land laws are not of a legislative character in the highest sense of the term (art. 4, § 3), 'but savor somewhat of mere rules prescribed by an owner of property for its disposal.' "

The power exercised by the Secretary in this case may be distinguished from the power sanctioned in the *Midwest Oil* case. The power there extended over public lands. The power here extends over Indian trust lands. But in both cases the property belongs to the United States. In both cases the power relied upon was frequently exercised. In *Midwest Oil, supra,* and Grisar v. McDowell, 73 U.S. (6 Wall.) 363, 18 L.Ed. 863 (1867) (also involving validity of public domain withdrawals) the court considered acts of Congress at least inferentially recognizing the Executive's power to withdraw. Congressional acquiescence may also be inferred in this case. The Act of March 3, 1927, 25 U.S.C. § 398d provides:

"Changes in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress: *Provided,* That this shall not apply to temporary withdrawals by the Secretary of the Interior."

There *is also some* indication of approving recognition of the Ickes withdrawal itself. The Act of July 24, 1956, 70 Stat. 626, returned surplus lands on the Colville Reservation to tribal ownership. The House Interior Committee observed in its report that:

"The lands classified as mineral were subject to location and disposal under the mineral-land laws of the United States. These lands were temporarily withdrawn from all forms of entry and disposition by departmental order of September 19, 1934 with a view to restoring them to tribal ownership under the Indian Reorganization Act of 1934 (IRA). However, since the Colville Indians excluded themselves from the IRA, the restoration of the lands to tribal status may be accomplished only by congressional authority." S. Rep.No.2557, 84th Cong., 2nd Sess. (1956).

The power to withdraw Colville reservation lands from mineral entry is also supported by the Secretary's historically broad authority over Indian affairs and Indian lands. See, *e. g.,* Parker v. Richard, 250 U.S. 235, 39 S.Ct. 442, 63 L.Ed. 954 (1919) (supervision of lease income); United States v. Birdsall, 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930 (1914) (authority to recommend sentences for violation of laws on liquor traffic with Indians); Udall v. Littell, 125 U.S.App.D.C. 89, 366 F.2d 668 (1966), cert. den. 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545, reh'r. den., 386 U.S. 939, 87 S.Ct. 452, 17 L.Ed.2d 812 (cancellation of contract of general counsel for Indian tribe).

The Act of June 30, 1919, 41 Stat. 34, 43 U.S.C. § 150 prohibits creation or enlargement of Indian reservations except by Act of Congress. But the Executive power to withdraw land does not conflict with this prohibition. The Ickes withdrawal did not create the Colville reservation. Nor did it enlarge the reservation. It simply proscribed alienation of surplus lands pending consideration of complete restoration to the Tribe. In Shaw v. Work, 56 App.D.C. 55, 9 F.2d 1014, 1015 (1925) the President had temporarily withdrawn land in anticipation of legislation creating a forest reserve. The power to create forest reserves or add to existing reserves, however, rested exclusively in Congress under 16 U.S.C. § 471. The appellant contended this statute pre-

cluded the withdrawal. The court held that:

"* * * The President, in the order here in question, is attempting neither to create a forest reserve, nor add to one already existing. He merely withdrew the land from settlement pending action by Congress, which alone has the power under the act to create forest reserves within the states therein named. In other words, the President withdrew the land, not to create a forest reserve, but that Congress might. However, the power of withdrawal is inherent in the President without the express authority of Congress. United States v. Midwest Oil Co., 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673."

It might also be concluded that the Secretary derived power to make the Ickes withdrawal from section 3 of the Indian Reorganization Act, 25 U.S.C. § 463(a). But that section does not grant withdrawal power expressly. In Bowman v. Udall, 243 F.Supp. 672 (D.D.C. 1965) the court indicated that the Ickes withdrawal was made pursuant to section 3 of the Act. The district court opinion was approved in Rundle v. Udall, 126 U.S. App.D.C. 335, 379 F.2d 112 (1967). The authority claimed in this case, however, could not rest exclusively on section 3 of the Indian Reorganization Act because of the adverse Colville vote.

■ I hold that the Secretary had power to withdraw surplus lands on the diminished Colville Indian Reservation from entry under the mining laws.

■ The effect of the Ickes withdrawal is to invalidate any mining location made while the order remained operative. This follows from the terms of the order itself and accords with the usual effect given such orders. Mason v. United States, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396 (1923); United States v. Midway Northern Oil Co., 232 F. 619 (S.D. Cal.1916).

Some of Consolidated's claims were located after the Colvilles rejected the Indian Reorganization Act.[7] With respect to these claims Consolidated contends that the Ickes withdrawal became *functus officio* upon the vote of the Colville Tribe.

Consolidated also alleges that the modifier "temporary" limits the existence of the order.

■ The fact that the withdrawal is termed a "temporary" one is not enough to hold the withdrawal inoperative before the 1956 restoration of the reservation lands to Tribal ownership. In Mecham v. Udall, 369 F.2d 1, 4 (10th Cir. 1966) the court upheld a temporary withdrawal of thirty-six years. The court declared that,

"* * * We cannot say that from the Government's viewpoint and considering its permanence compared to the life of man, and the significance of oil shale as a national resource, that this has not been temporary. There is evidence that investigations and studies are being conducted to carry out the purposes of the withdrawal. * * *"

Accord, Clinton D. Ray, 59 I.D. 466 (1947). The *Mecham* case involved a withdrawal under the Pickett Act, 36 Stat. 847. Section 1 of that Act provides that withdrawals pursuant to it shall remain in effect until revoked by the President or Congress. This might be considered a basis for distinguishing the *Mecham* case from the problem presented by the Ickes withdrawal. But the Pickett Act authorizes only "temporary" withdrawals. Were the withdrawal in *Mecham* thus not considered "temporary" (aside from the duration provision of the Act itself), the court would have been unjustified in sustaining it under the Act.

■ It also appears that the distinction between "temporary" and permanent withdrawals is one of kind, not of duration. This is the position taken by the

---

7. This category includes the Marvel and Majestic claims invalidated in decision 1; the Hiawatha and Lucky Strike claims invalidated in decision 2; and the Fluorescent claim invalidated in decision 6.

Interior Department. Memorandum, Validity of Orders Temporarily Withdrawing Public Land In Aid Of Legislation Looking To The Establishment of Indian Reservations, 60 I.D. 54 (1947). Other authorities agree.

"* * * A withdrawal of lands and their reservation for a present *use* rendered necessary for the discharge of the responsibilities vested in the Executive branch of Government is said to be permanent. * * * A withdrawal of lands for a public *purpose*, as distinguished from use, is said to be temporary." (Emphasis in original). Lowe, Withdrawals and Similar Matters Affecting Public Lands, 4 Rocky Mt. Mineral Law Inst. 55, 62 (1958).

See also, 40 Op.Atty.Gen. 73 (1941).

Whether the Ickes withdrawal became *functus officio* upon the adverse vote of the Colvilles is a more difficult question. The order declares reservation lands "temporarily withdrawn * * * until the matter of their permanent restoration to tribal ownership as authorized by section 3 of the Act of June 18, 1934, *supra* (Indian Reorganization Act), can be given appropriate consideration." Restoration of Lands Formerly Indian to Tribal Ownership, 54 I.D. 559, 563 (1934). This language appears to contemplate automatic termination of the withdrawal's effectiveness. In a private property law context such language would probably create a possibility of reverter as opposed to a right of entry for condition broken.

But there is some ambiguity in the order which militates against such a construction. Assuming an automatic termination, it is unclear whether the terminating event should be the end of "appropriate consideration * * * of restoration to tribal ownership" or the impossibility of restoration under the terms of section 3 of the Act. It was, of course, impossible to restore reservation lands to the Colvilles under the Indian Reorganization Act after they voted against its application. But administrative and Congressional consideration of "restoration of tribal ownership" continued until Congress finally accomplished the restoration in 1956.

A well considered opinion of the Solicitor's office of the Department of the Interior states that the withdrawal has remained effective despite the Colvilles' vote. Memorandum, Mining Locations On Colville Surplus Lands, 60 I.D. 318 (1949). Withdrawals in aid of proposed legislation have generally been considered as remaining effective despite failure of the legislation. Clinton D. Ray, 59 I.D. 466 (1947); Jackson Hole Irrigation Co., 48 I.D. 278 (1921). The fact that the purpose for which a withdrawal was made has been accomplished has been held not to work revocation of the withdrawal. Jackson, Lansing & Saginaw R. R. Co., 5 I.D. 432 (1887). *Clinton D. Ray, supra,* and *Jackson Hole Irrigation Co., supra,* involve withdrawals under the Pickett Act. Admittedly the language of that Act provides a basis for distinguishing them.[8] But the *Jackson, Lansing & Saginaw R. R. Co.* case, *supra,* does not involve a Pickett Act withdrawal.

These three cases and the Memorandum referred to above manifest a consistent administrative interpretation of withdrawal orders. According to departmental interpretation withdrawals remain effective. until revoked or modified by competent authority. This departmental interpretation does not distinguish between withdrawals pursuant to the Pickett Act and withdrawals pursuant to other sources of power. Whether such an interpretation of the Ickes withdrawal would recommend itself to the court were the language of the order considered *in vacuo* is not determinative. An agency's interpretation of its own regulations, for example, is accorded great weight.

---

8. "(S)uch withdrawals or reservations shall remain in force until revoked by him (the President) or by an Act of Congress." Pickett Act, § 1, 43 U.S.C. § 141.

" \* \* \* Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. \* \* \* (T)he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation. \* \* \* " Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413–414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), quoted with approval in Udall v. Tallman, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

The Department's interpretation of its own order may be likened to an agency's interpretation of its own regulations.

It also appears that this administrative Interpretation is supported by significant policy considerations. The legislative process, even prodded by administrative lobbying, is slow. Withdrawals may have to remain effective through several sessions of Congress if they are to have any efficacy at all. And were withdrawals held revocable by circumstances or procedures less formal than those attending their entry, confusion would be encouraged in the field of property law, a field in which certainty has undisputed advantages.

■ Therefore I hold that the Ickes withdrawal remained effective despite the vote of the Colville Tribe to reject the Indian Reorganization Act.

## IV

### *Estoppel*

On appeal of decision 2 Consolidated claimed that in a letter signed by an official of the Department of the Interior the effective date of the withdrawal was given as November 30, 1934. Consolidated also claimed that another official advised that metalliferous mining locations could be made regardless of the withdrawal. It appears that Consolidated relies on a letter dated July 9, 1935 from a person named Johnson with the title "Commissioner." Enclosed with this letter were a "circular" and a "directive" summarizing mining laws applicable to the public domain in Washington.[9]

■ For several reasons this letter and its enclosures do not estop the government. First, the letter and its enclosures make no mirepresentations. See note 9, *supra*. Any misunderstanding on the part of Consolidated must have followed a failure on the part of the corporation's agents to distinguish between laws applicable to the public domain and laws applicable to Indian trust lands.

■ Second, to allow an estoppel in this case would frustrate the public policy of protection of Indian lands and resources which lies behind the Ickes withdrawal, the Indian Reorganization Act and the Act of July 24, 1956, 70 Stat. 626, restoring the Colville Reservation to tribal ownership. "For no more than private contract can estoppel be the means of successfully avoiding the requirements of legislation enacted for the protection of a public interest." Scott Paper Co. v. Marcalus Manufacturing Co., Inc., 326 U.S. 249, 257, 66 S.Ct. 101, 105, 90 L.Ed. 47 (1945) (involving potential frustration of the patent laws). On this rationale estoppel was also held inapplicable in American Surety Co. of

---

9. Department of the Interior, General Land Office, Circular No. 1278, "Information In Regard To Mining Claims On The Public Domain;" Department of the Interior, General Land Office, Directive 96159, "Information For Mineral Prospectors." The circular, as its title indicates, concerned only locations on the public domain. It indicated that withdrawals made under the Pickett Act did not preclude metalliferous mining locations. But it also warned that some withdrawals barred location under the mining laws. The circular distinguished between public domain lands and Indian reservation lands.

The Directive discusses Executive Orders withdrawing public domain land from entry on November 26, 1934 and February 5, 1935 under the Pickett Act. The directive states that the lands so withdrawn remained subject to location under the mining laws.

New York v. United States, 112 F.2d 903, 906 (10th Cir. 1940). The surety company contended the United States was estopped to deny the validity of the assignment of a lease on coal bearing Indian lands. Applicable statutes and regulations rendered the assignment ineffectual without approval by the Secretary of the Interior. The court held:

" * * * The public policy of the United States to thus afford protection to the Indians with respect to leases of coal land was clearly manifested. To permit such prerequisite to validity to be rendered unnecessary by the application of the doctrines of estoppel, ratification, or laches would thwart that public policy." (Alternative holding.)

The manifested public policy of the United States and the effect upon that policy were the doctrine of estoppel applied are similar in this case.

 Nor could reliance by Consolidated or its officers be deemed justifiable or reasonable. The truth of the matter, the existence and purport of the Ickes withdrawal, was available upon inquiry at the local Land Office. "A person * * * in a position to know [the facts] can not claim the benefit of estoppel." Gaylord v. CIR, 153 F.2d 408, 416 (9th Cir. 1946) (dictum).

## V

### Adverse Possession

Before the Department Consolidated contended that its claims had been perfected by adverse possession. The only authority for adversely possessing mining claims is 30 U.S.C. § 38, which provides in relevant part that:

"Where such person or association, they and their grantors, have held and worked their claims for a period equal to the time prescribed by the statute of limitations for mining claims of the State or Territory where the same may be situated, evidence of such possession and working of the claims for

such period shall be sufficient to establish a right to a patent thereto * * *."

In Newport Mining Co. v. Bead Lake Gold-Copper Mining Co., 110 Wash. 120, 122, 188 P. 27, 28 (1920) two locators contested for possessory rights to a mining claim. The court held for the plaintiff "by reason of the fact that it has held adverse possession of the property in dispute for more than the statutory period of limitations and has performed the required annual labor." Continuing, the court stated:

" * * * The rule supported by the authorities is that, where a person has held and worked a mining claim for a period equal to the time prescribed by the statute of limitations for mining claims of the state where the same is situated, he has a right equivalent to that of a valid location. * * *"

See also, Teeter v. Brown, 130 Wash. 506, 228 P. 291 (1921) (laches applied in similar lawsuit). Upon this statement of the rule Consolidated relies.

But construing section 38 (in its superseded form, R.S. § 2332) the court of appeals stated in Chanslor-Canfield Midway Oil Co. v. United States, 266 F. 145, 151 (9th Cir. 1920):

"But the statute just referred to is a part of the statutory chapters on mineral and mining resources, having to do with the evidence which will be regarded as sufficient to establish the right of one in possession and who has worked a mining claim to obtain a patent. The statute is based upon the premise that the lands had been open to entry and could be patented under the mining laws of the United States. It was not enacted as a statute of limitation, and has no application in the case of a trespasser on land, title to which cannot be acquired under the laws of the United States."

Accord, United States v. Midway Northern Oil Co., 232 F. 619 (S.D.Cal.1916).

In Glacier Mt. Silver Mining Co. v. Willis, 127 U.S. 471, 481, 8 S.Ct. 1214,

1217, 32 L.Ed. 172 (1888) the plaintiff sought recovery of a mining claim. Possession and payment of taxes for five years were alleged. The defendant demurred to the complaint on the ground that no valid location was alleged. The court held, "This, under the laws of Colorado [apparently the revelant statute of limitations], would give the plaintiff a right to the premises in dispute superior to any other claim, except that of the government." Accord, Harris v. Equator Mining & Smelting Co., 8 F. 863 (D. Colo.1881) (dictum); Rocky Mt. Mineral Law Foundation, 2 Am.Law of Mining § 9.9 at 312, n. 12 (1967).

■ Thus it appears that the rule upon which Consolidated relies is twice qualified. First, it does not apply if the land is not open to entry under the mining laws and subject to patent. This, of course, is the effect of the Ickes withdrawal. Second, it does not apply against the United States. But Consolidated seeks to adversely possess against the government. The adverse possession question was correctly determined by the Department.

### VI

#### *Prior Locations*

■ Consolidated alleges that a number of its claims are relocations of prior claims. Some evidence was adduced on this contention at the trial. The evidence was generally unsatisfactory. It should not be considered in any event, because "the Administrative Procedure Act does not permit a trial de novo of administrative decisions." Coleman v. United States, 363 F.2d 190, 193 (9th Cir. 1966); Adams v. United States, 318 F.2d 861 (9th Cir. 1963). (Both cases involve review of mining claim decisions by the Department of the Interior.) The evidence unearthed

by the Bureau consisted merely of location notices filed subsequent to the Ickes withdrawal and a "Notice of assessment work completed: and intention to hold mining claims."

■ This "Notice" was filed on behalf of Consolidated before the Ickes withdrawal. It names several of the claims voided by the Bureau in decisions 2, 3 and 6 for location after the withdrawal.[11] This instrument failed to recite dates of location, descriptions of the claims, or references to natural objects or permanent objects as required by R.C. W. § 78.08.050. Therefore it was insufficient to establish valid locations of the enumerated claims. Knutson v. Fredlund, 56 Wash. 634, 106 P. 200 (1910).

■ The location notices before the Bureau may be segregated into three categories. Five of the claims are specifically declared to be relocations of abandoned claims.[12] With respect to these claims Consolidated's rights cannot date from a time prior to the date of relocation. The trial court in Cheesman v. Shreeve, 40 F. 787, 789 (D.Colo.1889) charged the jury as follows:

"* * * (I)f ground once included within the location of a lode mining claim be abandoned, and a new location made thereon, as abandoned ground, said location dates only from the relocation thereof as abandoned ground, and does not relate back to or obtain any rights on account of the location which has been abandoned, * * *."

Accord, 2 American Law of Mining § 8.6 at 198, 199.

■ A number of claims located after the Ickes withdrawal were declared to be partial relocations of abandoned claims.[13] To this extent, these claims are subject to the rule of Cheesman v. Shreeve, *supra*.

---

11. The "Notice" refers to the Sunset, Sunrise, Porphyry and Golden Eagle claims invalidated in decision 2; the Surprise Fraction claim invalidated in decision 3; and the Silver King and Silver Pride claims invalidated in decision 6.

12. Gold King, Golden Eagle, Chloride No. 5, Sunrise, Sunset.

13. Blue Bird, Peerless, Peerless Amended, Imperial, Imperial Amended, Parvenue, Porphyry.

■ To the extent the claims enumerated in note 13, *supra*, were not relocations of abandoned claims they may be classified with those claims located by notices making no reference whatever to prior locations.[14] As far as the Bureau could determine, these claims were established by original location notices filed after the Ickes withdrawal. If, as Consolidated maintains, some of these claims were relocations of prior, valid but defective claims, the Ickes withdrawal might not invalidate the relocations. The general rule is that relocations (or amendments) relate back to original, valid although defective locations through which the relocator claims. Kirkpatrick v. Curtiss, 138 Wash. 333, 244 P. 571 (1920); 2 American Law of Mining § 8.25. On the other hand it is generally held that relocation will not relate back to the detriment of intervening rights. Karnes v. Flint, 153 Wash. 225, 279 P. 728 (1929); 2 American Law of Mining § 8.25. Some authorities refuse to apply this exception to the relation back rule if the relocator is attempting merely to perfect his claim to ground included in the original location. See cases cited at 2 American Law of Mining § 8.25 at 237, n. 6.

■ But whether or not the Ickes withdrawal vested intervening rights in the Colvilles which would preclude application of the relation back rule need not be determined here. The Bureau found no evidence, and Consolidated produced none, of prior locations by Consolidated on these claims. Nor was there any evidence before the Bureau of a chain of title leading to Consolidated from holders of prior, identifiable locations. A relocation cannot relate back unless the original location notice is proved. United States v. 237,500 acres of land; 236 F.Supp. 44, 47 (S.D.Cal.1964).

■ It follows that Consolidated's rights to the claims included within decisions 1, 2, 3 and 6 date from the location (or relocation) notices filed after the Ickes withdrawal. The claims are, therefore, invalid. United States v. M'Cutchen, 234 F. 702 (S.D.Cal.1915); Jose v. Houck, 171 F.2d 211 (9th Cir. 1948).

## VII

### *Lack of a Valid Discovery*

■ In decision 5 the Bureau declared a number of claims invalid for lack of a valid discovery. Consolidated chose not to appear at the Bureau hearing. The evidence adduced at the hearing included a number of expert opinions to the effect that a prudent man would not be justified in spending time and money on these claims in the hope of developing a paying mine. Consolidated claims that these expert's opinions included an improper "marketability" factor. Perusal of the record indicates, however, that the expert's testimony, the hearing examiner's decision and the Bureau decision were all based on the "prudent man" test set forth in Castle v. Womble, 19 L.D. 455 (1894). This test has often been approved by the Supreme Court. United States v. Coleman, 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968) (dictum); Best v. Humboldt Placer Mining Co., 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); Cameron v. United States, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659 (1920); Chrisman v. Miller, 197 U.S. 313, 25 S.Ct. 468, 49 L.Ed. 770 (1905). In any case, the marketability factor of which Consolidated complains was approved recently in United States v. Coleman, *supra*. The agency finding is amply supported by the evidence as well.

Decision 4 was based on the same ground. A decision on the claims involved in decision 4 will await submission of the record.

## VIII

### *Conclusion*

The records of proceedings before the Department of the Interior culminating in decisions 1, 2 and 5 (fn. 1, supra) have

---

14. Marvel, Majestic, Lucky Strike, Hiawatha.

been considered in determining this case. Decisions 1, 2 and 5 are affirmed in the mining claims named therein (fn. 1, supra) will by judgment entered hereafter be declared invalid. The records on which the Department determined decisions 3, 4 and 6 have not been before the court. Defendant is granted 30 days to file the records with the Clerk. If they are not filed within 30 days judgment will be entered invalidating the claims named in decisions 3, 4 and 6. When and if the records are so presented, they will be examined and a supplemental opinion filed.

Done by the Court this 28 day of June, 1968.

Charles L. Powell
United States District Judge

Following the filing of the first opinion on June 26, 1968, the parties stipulated that the administrative records on decisions 3, 4 and 6, be filed with the court and the records were filed. No further evidence, except the above administrative records were considered. On December 18, 1968, the trial court filed a supplemental opinion. We adopt the following portion of that opinion.

United States District Court
Eastern District of Washington
Northern Division

United States of America,

Plaintiff,

vs.

Consolidated Mines and Smelting Company, Ltd., a corporation, and Hugh Brown,

Defendants.

Civil No. 2412

## SUPPLEMENTAL OPINION

This opinion supplements the opinion previously entered in this cause on June 28, 1968. Attention is called to the latter portion of that opinion which, on page 449, recites:

"The records on which the Department determined decisions 3, 4 and 6 have not been before the court. Defendant is granted 30 days to file the records with the Clerk. If they are not filed within 30 days judgment will be entered invalidating the claims named in decisions 3, 4 and 6. When and if the records are so presented, they will be examined and a supplemental opinion filed."

This supplemental opinion concerns only decisions 3, 4 and 6 of the Department of the Interior. The administrative records are now before the Court. For a description of the decisions and the mining claims affected by them, see Footnote 1, page 437, of the original opinion.

The claims included in decisions 3 and 6 were invalidated for location subsequent to the Ickes withdrawal described in the original opinion. No prior locations of these claims were proved by Consolidated. Both decisions were made without the administrative hearings required by the authorities cited in Part II of the earlier opinion. Decision 3 was appealed to the Director, Bureau of Land Management, and affirmed. On appeal Consolidated did not raise the issue of the denial of administrative hearings. Under the authorities cited in the earlier opinion it appears that Consolidated has waived the right to object to this error in decision No. 3.

The claims included within decision No. 4 were invalidated for lack of valua-

ble mineral discoveries. The minerals discovered by Consolidated on these claims included gold, silver, copper, zinc, molybdenum, quartz and iron. The Bureau's experts testified that none of the Consolidated's discoveries were significant enough to lead a prudent man to expend time and money in the reasonable hope of developing a valuable mine. More specifically these experts testified that none of the minerals discovered by Consolidated could be marketed or even extracted at a profit. Reliance upon this marketability factor by experts and the hearing officer is within the "prudent man" test of discovery. There was substantial evidence to support the hearing officer's determination. See United States v. Coleman, 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968). Decision No. 4 of the Department of the Interior is affirmed.

\* \* \* \* \* \*

Done by the Court this 18 day of December, 1968.

CHARLES L. POWELL
United States District Judge

■ The court below considered the general rule laid down in United States v. Sing Tuck, 194 U.S. 161, 24 S.Ct. 621, 48 L.Ed. 917 (1904) to the effect that under the doctrine of the exhaustion of administrative remedies, failure to appeal an administrative decision to a higher administrative authority precludes judicial review. The court below held that the last sentence of § 10(c) of the Administrative Procedure Act, 5 U.S.C. § 704, enacted in 1946, abrogated the rule laid down in *Sing Tuck*. In doing so the court below relied upon Davis, Administrative Law Treatise, (1958) and various sections therein; and relied upon the position of the Office of the Attorney General in its contribution to Congressional evaluation of the Administrative Procedure Act. In substance, the court below held that intra-agency appeals or taking the last step in such appeals was not a prerequisite of judicial review unless a statute governing the agency's action requires exhaustion or determines finality, or unless the agency, had by its own rule, provided that all agency procedures must be exhausted, and that the decision appealed from remain inoperative pending appeal.

Our panel, in considering these appeals, was immediately faced with two problems, (1) whether affirming the district court on its position taken below on decisions No. 1 through No. 5, would require an in banc of the case as contrary to and overruling prior decisions of this court, and (2) whether the affirmance of the decision below would have a devastating effect by increasing the work of the district courts.

In two cases decided by this court involving mining claims, the court has held generally that administrative procedures must be exhausted. In Mulkern v. Hammitt, 326 F.2d 896 (9 Cir. 1964) the appellant in an appeal from the Acting Director's decision to the Secretary of the Interior, did not include in his appeal reference to a part of the decision relating to mineral water. The court said: "Because of the failure . . . [of the appellant] to exhaust his administrative remedy, we do not consider or decide the question concerning the mineral waters." [P. 898] The administrative decision was allowed to stand, undisturbed, by the district court. No reference was made to § 10(c) of the Administrative Procedure Act, 5 U.S.C. § 704, and no consideration therefore given to the last sentence of that section.

In Davis v. Nelson, 329 F.2d 840 (9 Cir. 1964) the court considered generally the Administrative Procedure Act, but held "plaintiffs first must follow the course of administrative procedure to finality before appealing to the courts for relief." [P. 847] The court did not consider the last sentence of § 10(c) of the Administrative Procedure Act, 5 U.S.C. § 704. We think this distinguishes the two cases, and that a decision in banc is not required.

We note also that the government, although unhappy with the decision below, as to the lower court's holding on decision

No. 6, which we consider later, stated at argument that it could "live with" the lower court's opinion on the first five decisions of the Department of the Interior and cited in a footnote to its brief the *Mulkern* and *Davis* cases referred to above, bearing on the doctrine of exhaustion of administrative remedies.

It is apparent why the government can "live with" the decision below. The agency may by rule require that all appellate steps be taken within the agency and that all remedies be exhausted before the applicant may seek a review in the court. Secondly, the rule urged by Davis in his work on Administrative law and adopted by the trial court, does not affect the rule that the claimant must *raise his question* in the agency proceedings, before he applies for judicial review. See, Davis, Administrative Law Treatise § 20.06 (1958). The holding below is limited, and states "Intra-agency appeals are not a prerequisite to judicial review except to the extent statutes or appropriate agency rules command otherwise," [P. 440, supra]

The above discussion answers our problem as to whether the affirmance of the decision below would flood the district courts with cases not heretofore subject to review by a district court. The applicant pressing a mining claim, must in any event go to the agency for review, but he need not take all the appellate steps available to him.

We also hold that our decision today applies only to mining claims and does not apply to the rule of exhaustion of remedies as it may appear in other decisions of this court, involving other agencies. We have not had an opportunity to review them in detail, and statutes as well as agency rules must be considered as to what effect the last sentence of § 10(c) of the Administrative Procedure Act may have in other cases. See, McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) where the Court recognized that the exhaustion doctrine "must be tailored to fit the peculiarities of the administrative system Congress has created." [P. 195, 89 S.Ct. p. 1663]

### Appeal by the United States No. 25164 Decision No. 6

The district court pointed out in its opinions below that decisions 1, 2, 3 and 6 were rendered without contested hearings; that as to decisions 1, 2 and 3 the absence of hearings was not raised at any stage of the proceedings, and that Consolidated had waived the objection by not asserting it before the agency. In its findings and conclusions of law, the trial court found as to decisions 1, 2 and 3, that Consolidated had failed to assert in the agency the denial of an administrative hearing and thereby waived reliance thereon.

The court relied on Adams v. Witmer, 271 F.2d 29 (9 Cir. 1959) and United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952), and stated, "These cases exemplify the corollary of the exhaustion doctrine which precludes judicial consideration of issues not presented to Administrative agencies." [P. 441, supra].

As to decision 6, the trial court concluded that the agency was in error in not affording Consolidated an administrative hearing on said decision; that Consolidated did not waive its right thereto, and accordingly reversed the administrative determination as to decision 6. In its decision below, the trial court stated as to decision 6, "The decision was not appealed to the department; Consolidated did not have an opportunity to make timely objection to the Land Office manager about the absence of a hearing. His decision was made without a prior notice of a contested hearing. In this instance, Consolidated has not waived its right to object, therefore decision No. 6 is reversed."

In its ruling on decision 6, the trial court was in error. There is no dispute that although no notice of hearing was given or contested hearing held, Consolidated was given notice of the decision by the manager of the Land Office. The decision expressly stated it

would become final within 30 days from its receipt unless an appeal was taken to the Director, Bureau of Land Management. The decision explained the amount of the filing fee required, and pointed out the appeal must be taken in strict compliance with the rules in 43 CFR Part 221. Consolidated did nothing. No appeal was taken. The question of the lack of notice of the hearing or lack of contested hearing was never raised before the agency. Consolidated clearly waived its right to raise this question of hearing in the agency, as it did in the case of decisions 1, 2 and 3.

Sustaining the district court as to decision No. 6 would create an anomaly. It would mean that a mining claimant waives no issue by not appealing at all, but waives the issues not urged when he pursues the appeal.

On the basis of Adams v. Witmer, *supra*, and United States v. L. A. Tucker Truck Lines, Inc., *supra,* we hold that Consolidated waived the right to complain about the lack of a hearing by never raising the question before the agency, although afforded an opportunity to do so.

 Moreover, from the record, it is clear Consolidated was not entitled to a hearing or contest on the claims involved in Decision No. 6. It was stipulated that the three claims affected by Decision No. 6 were invalidated for the reason "Located after withdrawal of lands" [R. 148]. The Ickes withdrawal is shown in "Restoration of Lands, Formerly Indian, to Tribal Ownership." 54 I.D. 559 (1934). Two of the claims were located on April 17, 1935 and the third on June 24, 1956.

The trial court held that the Secretary (Ickes) had power to withdraw the surplus lands on the Colville Indian Reservation from entry under the mining laws; [P. 444, supra] and that the withdrawal remained effective despite the vote of Colville Tribe to reject the Indian Reservation Act, 25 U.S.C. § 461 et seq., § 478. [P. 446, supra].

Since we adopt the district court opinion as to the Ickes withdrawal, and the effect of the tribal vote, the claims were located on withdrawn land and there was no factual issue to be decided.

 It is settled law that when no fact question is involved or the facts are agreed, a plenary, adversary administrative proceeding involving evidence, cross-examination of witnesses, etc., is not obligatory—even though a pertinent statute prescribes a hearing. In such situations, the rationale is that Congress does not intend administrative agencies to perform meaningless tasks. See FPC v. Texaco, 377 U.S. 33, 39–44, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); Dyestuffs and Chemicals Inc. v. Flemming, 271 F.2d 281, 286–287 (C.A.8, 1959), cert. den. 362 U.S. 911; Sun Oil Co v. FPC, 256 F.2d 233, 240–241 (C.A.5, 1958), cert. den. 358 U.S. 872, 79 S.Ct. 111, 3 L.Ed.2d 103.

Dredge Corporation v. Penny, 362 F.2d 889 (9 Cir. 1966) held there was no question of fact where claims were filed on land classified under the Small Tract Act, 52 Stat. 609 (1938), 43 U.S.C. § 682a and where the claims were held invalid without notice of hearing. Ferry v. Udall, 336 F.2d 706 (9 Cir. 1964) cert. den. 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed. 2d 286, sustained a rejection of application for lands under the Isolated Tracts Act, R.S. Sec. 2455 as amended, 43 U.S.C. § 1171 where there was no hearing. See United States v. Walker, 409 F.2d 477, 481–482 (9 Cir. 1969).

The trial court had concluded in its first opinion:

"The Bureau found no evidence, and Consolidated produced none, of prior locations by Consolidated on these claims. Nor was there any evidence before the Bureau of a claim of title leading to Consolidated from holders of prior, identifiable locations. A relocation cannot relate back unless the original location notice is proved. United States v. 237,500 acres of land, 236 F.Supp. 44, 47 (S.D.Cal.1964).

It follows that Consolidated's rights to the claims included within decisions

1, 2, 3 and 6 date from the location (or relocation) notices filed after the Ickes withdrawal. The claims are, therefore, invalid. United States v. M'Cutchen, 234 F. 702 (S.D.Cal.1915); Jose v. Houck, 171 F.2d 211 (9th Cir. 1948)." [P. 449, supra].

No additional evidence was received after the first opinion except the administrative records. There was nothing new in the record to justify a change in the findings and conclusions made in the first opinion.

In its formal findings of fact and conclusions of law, filed on May 16, 1969, the findings of fact and conclusions of law closely paralleled the material in the opinion. Finding IX, F, as to decision 6 stated that the mining claims "were declared null and void for the reason that the location notices and the records of Ferry County showed that the claims had been located after the Ickes withdrawal order of September 19, 1934, removing the lands of the Coleville Indian Reservation from mineral entry. The decision of the Land Office Manager was made without affording defendant Consolidated, an administrative hearing."

"The defendant Consolidated did not appeal this decision to the Director of the Bureau of Land Management or to the Secretary of the Interior." In conclusion of law IX, a similar statement appeared, plus the conclusion, "The defendants did not waive their right to a hearing on said decision and the court concludes administrative determination as to Decision No. 6 should be reversed."

Having found that the withdrawal was authorized and that the claims were located after the 1934 withdrawal order, the district court should have affirmed decision 6.

Accordingly, we reverse the district court as to decision 6 and direct that on remand, judgment be entered for appellant, United States.

*Cross-appeal of Hugh Brown in Appeal No. 25241*

On August 26, 1971, the cross-appeal of Hugh Brown was dismissed by a motion panel of this court for lack of prosecution.

On October 21, 1971, there was received by the clerk, a motion to set aside the above order of dismissal, for permission to file briefs in typewritten form and for continuance of the oral argument then scheduled. The case was by that time assigned to the present panel. On November 3, 1971, an order was made by this panel, denying the motions.

Brown suffered no prejudice by the dismissal of his appeal. On cross-examination Brown stated that he did not have title as an individual to any of the 56 mining claims involved:

"Q. So, all of these claims, as far as you are concerned, any interest or title in them belongs exclusively to Consolidated Mines and Smelting Company, Limited?

A. That is right."

The judgment is affirmed as to decisions 1, 2, 3, 4 and 5 and reversed as to decision 6 and remanded for entry of a judgment in favor of the United States.